## Wm. B. Hyman *v.* L. Bailey et als.

*A vendor who is not bound in warranty is a competent witness to testify in a case where the title of property sold by him is involved.*

*Where a power of attorney authorizes an agent to sell, but is silent as to the right of acquiring property, a purchase by the agent exceeds his delegated powers, and may be repudiated by the principal.*

APPEAL from the District Court of the Parish of Rapides, *Cullom*, J. *W. B., J. C. & E. T. Lewis* and *J. K. Elgee*, for plaintiff. *Ryan & Orsborn*, for defendant and appellant.

Duffel, J. This cause was, by this court, remanded to the lower court, for further proceedings. See 13 An. 450. And the judgment on the second trial having decreed the title of the property to be in the plaintiff, the defendants appealed.

The refusal of the District Judge to allow the call in warranty of *Waters* and *Hughes*, was proper, under one of the causes sustaining a similar ruling, when the case was first before us, to-wit : that *Waters*, in his sale, expressly limited his warranty to his own acts, and those claiming under him ; *Hughes*, the vendor of *Waters*, stands in the same light, having likewise sold without warranty. And, as *Waters* is not bound in warranty in the present form of action, he is not incompetent to testify, on the score of interest.

The District Judge did not err in refusing to charge the jury that, "If they were satisfied, from the evidence, that the sale from the plaintiff, *Bailey*, to *Hughes*, was accompanied with delivery and *bona fide* possession by the said buyer, *Hughes*, the validity of said transfer, though made in fraud of his creditors, could not be tested by the seizure of *Bailey's* creditors, but that they must resort to the revocatory action, or action of simulation." Such a charge was calculated to mislead the jury ; for the real question submitted to the jury was the reality of the title of *M. Maillon*, the vendee of *Waters*.

The conclusion to which we have arrived, on the merits, does not require us to pass on the other bill of exception.

We will now proceed to examine the case on its merits.

The plaintiff can only succeed in this action by proving simulation ; as otherwise the apparent title is in the estate of *M. Maillon*, f. w. c.

The property in controversy was sold by *Littleton Bailey* to *J. J. Hughes* on the 3d December, 1840, who sold on the 26th June, 1847, to *W. Waters, Jr.*, who, on the 14th of May, 1853, sold to *Merrick Maillon*, through her special attorney in fact, *Littleton Bailey ;* this last sale was for $5000, represented in two notes of $2500 each, made by the agent, and payable at one and two years. The power of attorney to *L. Bailey* was executed on the 5th of March, 1851, and it authorizes the agent to sell all her property, real and personal, lands and slaves, but is silent as to the right of acquiring property and signing notes. We have already stated, that *Hughes* and *Waters* made a simple conveyance of their right, title and interest.

The parties in all the above recited conveyances, dispensed with the certificate of mortgages required by law ; and it appears from the certificate of mortgages

which is in the record, that mortgages forming in the aggregate a large amount, have, at various dates from 1840 inclusive, been recorded against *L. Bailey.*

We also see *L. Bailey* pledging, by public act bearing date the 29th of March, 1855, to a commercial house in New Orleans, his future *crops of cotton and corn, revenues and rents,* to secure to them $1,273 24 then due by him for advances made to him " for the purpose of carrying on and maintaining his property or plantation of Rock Island (the very land in controversy) Rigolet Bon Dieu, in the parish of Rapides, &c.," as also to secure the payment of all sums which may be hereafter advanced to him.

The witness, *J. N. Lewis,* the father-in-law of *L. Bailey,* " was the first occupant of the land, went on it in the spring of 1846, it was a perfect wilderness." He considered that he was living on the land of *Hughes,* remained there until the 1st of January, 1853; never paid rent to *Hughes* and *Waters;* the crops of the two last years were 50 to 60 bales. " The crops made while witness was there were divided, witness taking half; the crops were shipped to *DeGruy & Co.* under the mark *B. & L.* signifying *Bailey & Lewis,* the crops sold by the merchants and proceeds applied one-half to witness, and the other half to whomever entitled to it."

The testimony of *Waters,* when taken together, is such as to convince us that he never considered himself as the owner of the land, but simply as holding the same for *L. Bailey.*

This witness, in answer to the 3d interrogatory, says : "As well as I recollect, *L. Bailey* asked me a short time before the transfer of the land was made to me, if I could accept of the transfer under the conditions which it was afterwards conveyed to me; to which I think my reply was, that I had no particular objection, having been on the property before the transfer was made to me. I think *Bailey* and myself were on the property the fall before it was conveyed to me; our business there was to look at several mill seats, one or two of which *Bailey* pointed out as being on the land in question. *Bailey* and myself had several conversations at various times after the transfer of the land to me, the substance of which will be given in answer to the different interrogatories propounded after this, as well as I can recollect them."

The witness having been asked, interrogatory 4, " If there was not an express, was there not a tacit understanding between you and *Bailey,* that you were to hold the land for him, but of course to be saved harmless upon the notes you gave ?"

(We will here remark, that *Waters* had given, as a consideration of the price of the land, his two notes forming in the aggregate $4,800.)

He answered as follows :

" There was a mere verbal understanding between *Bailey* and myself to that effect, at the time the land was conveyed to me. The title to the land was then pending between *Hickman* and *Bailey;* and some six or eight months after the land had been transferred to me, from some remarks that *P. L. Hickman* made to me, I applied to *L. Bailey,* supposing he either held my notes, or knew where they were. To which he informed me that he had them. I then informed him that I was somewhat fearful about the title to the land, and that I wished some guarantee against the payment of my notes, in case the title to the land should be lost; to which *Bailey* informed me he had my notes in his possession, and that he would give me any guarantee that I required, he, *Bailey,* appearing to be perfectly satisfied about the title to said land. Accordingly, there was written on the back of each of my notes, to convey the meaning, that in case the title to the

land should prove worthless, then my notes were to be void, otherwise to remain in force against me."

Answer to the fifth interrogatory : " I did not purchase the property with the view that it would result to my benefit ; but owing to the condition under which I accepted of the conveyance, the land was all that I had to secure me against the payment of my notes."

This witness also states, that he was only twice on the land, once before and once after the sale to him ; that he took up his notes by giving in exchange those of his vendee ; the exchange was made with *Bailey ;* does not recollect of ever having been called on to pay his notes ; *L. Bailey* proposed the transfer to *M. Maillon,* to which he consented on condition that he or she would return to him his notes ; does not recollect having had any conversation with *M. Maillon* about the matter ; *Bailey* attended to the whole matter from beginning to end.

From the above exposition of the facts, it cannot be well doubted that the title of *Waters* was the title of *Bailey,* in fact, that *Waters* held the land for *Littleton Bailey ;* and it now remains to be seen if the sale from *Waters* to *Maillon* was a bona fide, or a simulated transaction.

The evidence is conclusive, that *M. Maillon* was the concubine of *L. Bailey ;* that they lived together up to the date of the marriage of *Bailey,* in June, 1852, (*M. Maillon* died in November, 1853). It is true that *Maillon* moved on the land after the conveyance from *Waters,* and took her slaves with her ; yet we see *Bailey* visiting the place as he was wont to do before. The father of *Mrs. Bailey* says that on the day of her marriage, *Bailey,* as agent of *Maillon,* executed in her favor " a deed of some kind." The fact is, apart from the loose declarations made by *Maillon* to two of the witnesses examined in the case, we have no evidence of an acceptance by *Merrick Maillon* of the sale made without authority to her agent ; and had the transaction been a fair and bona fide one, the heirs could successfully, even now, repudiate the sale and refuse to pay the notes furnished by the agent, on the ground that he had exceeded his delegated powers. C. C. Arts. 2966, 2990.

Viewing the case in all its parts, we conclude that *Maillon* never acquired a title to the land, and that it was legally seized and sold as the property of *Littleton Bailey.*

Judgment affirmed.